1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                Case No.  1:23-CR-00001 JLT SKO

12                  Plaintiff,                ORDER DENYING DEFENDANT'S
                                              MOTION TO SUPPRESS
13          v.
                                              (Doc. 47)
14   ARTURO MARQUEZ,

15                  Defendant.

16

17          Mr. Marquez contends that evidence seized at his home should be suppressed because the

18   search warrant was overly broad. He asserts also that the subsequent search of his cell phones

19   violated the Fourth Amendment because the officer failed to limit himself to the date range

20   specified by the search warrant. The Court disagrees. Consequently, the motion to suppress the

21   evidence is **DENIED**.

22   **I.     BACKGROUND**

23          On September 4, 2022, Fabiola Pimental[1] contacted the San Luis Obispo Sheriff's Office

24   to report that her husband's panel truck, which had been parked at a self-storage yard, had been

25   stolen sometime between August 28, 2022 and September 4, 2022. (Doc. 53-1 at 4) She reported

26   that "she stores her business inventory in the box truck portion. The vehicle contained a variety of

27

28   [1] Ms. Pimental's husband, Victor Pimental, was in Mexico at the time and had been there for several
     weeks. Ms. Pimental made her report to Deputy Aranda Alvarado.

                                                    1

1    'Tres Toros' boot merchandise. She estimated the value of the contents at $50,000 dollars. There
2    were no unique marks on the boots or boot boxes. The boot boxes are red and black and the logo
3    depicts three bull heads."

4      Detective Abel Corona went to the self-storage yard and watched the security camera
5    footage from the storage yard. (Doc. 47-1 at 6) The security camera footage revealed that the
6    truck had been stolen on August 31, 2022. *Id.* at 7. Detective Corona learned that the passcode
7    used to enter the storage facility at the time of the theft, belonged to a person, Cota, who had
8    rented a storage unit before the theft. *Id*. at 6-7.

9      Detective Corona reviewed the footage for other times the passcode was used. (Doc. 47-1
10    at 7-8) On August 29, 2022, the video footage showed a gray Toyota Sienna van enter the facility
11    using Cota's passcode. (*Id*. at 8) The van drove to Pimental's box truck, and the male passenger
12    from the van got out and managed to enter the cab of the box truck. *Id*. He opened the hood of the
13    box truck and appeared to be doing something under the hood. *Id*. After about 20 minutes, the
14    male returned to the van, and the van left the facility. *Id*. A short time later, the person was
15    dropped off at the keypad at the entry to the facility. *Id*. The person punched in Cota's passcode
16    incorrectly a couple of times, before finally gaining entry. *Id*.

17      On August 31, 2022, the video footage showed the Toyota Sienna van returning to the
18    self-storage yard. (Doc. 47-1 at 8) The passenger from the van entered the facility using Cota's
19    passcode. *Id*. He walked into the facility and directly to the box truck. *Id*. He entered the cab of
20    the box truck and drove it away from the facility. *Id*. The Toyota Sienna van followed directly
21    behind it. *Id*.

22      Detective Corona contacted Ms. Pimental on September 8, 2022 because she wanted an
23    update on the investigation. (Doc. 47-1 at 8) During this call, Detective Corona asked Ms.
24    Pimental if she had additional details that she had not remembered to tell the original deputy. *Id*.
25    She explained she had seen the video footage from the storage facility, which reminded her that
26    she had seen the Toyota van parked neared the storage facility about two weeks before the theft.
27    *Id*. She recalled commenting to her daughter's that the van looked suspicious because it did not
28    have license plates on it and the people in the van appeared to try to conceal their faces. *Id*. She

said she didn't think too much about this until seeing the video footage. *Id*. Ms. Pimental reported also that she used the box truck to store "boots, belts, vests and hats." (Doc. 47-1 at 8) She estimated that she had at least $50,000 worth of merchandise in the truck and that the truck was worth about $7,000. *Id*. She reported also that there was not much gas in the truck, so she surmised that the thieves would have had to have stopped to buy gas. *Id*.

As a result of this information, Detective Corona gathered other video footage from surveillance camera in the area and discovered further footage of the stolen truck going into a Chevron gas station with the Toyota van following. (Doc. 47-1 at 8) Cameras were able to capture an image of the rear license plate of the Toyota van, and Detective Corona determined that it was registered to the defendant. *Id*. "Using a law enforcement license plate reader data base," Detective Corona determined that the box truck was near an intersection in Bakersfield, California. *Id*. at 10. A deputy with the Kern County Sheriff's Office drove by the area and saw the Toyota Sienna van parked in the driveway at 4612 Bergquist Avenue in Bakersfield, California and saw the top of the box truck parked in the backyard. *Id*. Also present at the house was a vehicle that was like the one that had taken Cota to the storage facility to rent the storage unit. *Id*. Finally, a search of the address revealed that the defendant was associated with it, due to calls to law enforcement. *Id*.

Based upon this information, Detective Corona sought a warrant to conduct a search at the Bergquist address. (Doc 47-1) Detective Corona sought permission to search for the box truck and "Merchandise consisting of 'Tres Toros' boots, hats, vests and belts. Estimated to be $50,000 worth of merchandise." *Id*. at 12. He also sought permission to search for, "Any recording device, computers, cellular phones, DVR recorders/recordings. Any property and/or items identified as being stolen or illegal to possess" and "Any items tending to establish the identity of persons who have dominion and control of the location, premises, automobiles, or items to be seized . . ." *Id*. Detective Corona attested that "seizing cellular phones will help gather evidence to prove Arturo Marquez was involved in the commission of auto theft and theft of merchandise. Cell phones store data such as GPS locations, text messages, call logs, and pictures. DVR recorders and recordings will help establish a timeline as the time the stolen box truck arrived at the residence."

3

*Id*. The court issued the search warrant on September 14, 2022. (*Id*. at 1-4)

During the search, the officers located the box truck in the backyard, though it was largely disassembled, and found 21 boxes of Tres Toros boots in the garage, two pounds of methamphetamine, 13 firearms, "thousands of rounds of ammunition," parts to "multiple stolen vehicles," two cell phones, two DVRs and a memory card. (Doc. 47-1 at 53) Detective Corona then sought a second warrant to be allowed to search the cell phones, DVRs and memory card that were seized during the search. (Doc. 47-1 at 42-56) In support of this warrant request, Detective Corona recited the information related to the theft, which supported the first search warrant, and he also detailed the the items found. *Id*. at 42-53. He attested that searching these items would assist in locating "evidence to support the crime of auto theft, possession of a controlled substance for sale, felon in possession of firearms; possession of a controlled substance and operating a chop shop. It will also help law enforcement obtain possible leads on the missing stolen merchandise. Your affiant also believes that by searching these items co-conspirators will be identified." *Id*. at 53. Detective Corona explained why he believed this was the case and his experience in this regard. *Id*. at 53-55. He sought to search the items for information dated from August 1, 2022 through September 15, 2022. *Id*. at 55. The court issued the search warrant on September 27, 2022. *Id*. at 42-43.

Detective Speake, from the CHP, performed the Cellebrite extraction on the cell phones[2]. (Doc. 47-1 at 57-63) In reviewing the extraction, Detective Corona located several photos of the defendant with firearms and messages related to him selling firearms. *Id*. at 64. He located also photos detailing the theft of the box truck, including, for example, photos of the storage facility, the box truck and the Tres Toros boots. *Id*.

The court issued another search warrant on October 7, 2022, which expanded the date range of the search to begin on January 1, 2022. (Doc. 47-1 at 67-68) In support of this warrant request, Detective Corona again explained the details of the theft of the box truck and the subsequent search at the Bergquist home. *Id*. at 71-78. He explained also that while searching the electronic devices, he "found evidence Marquez was in possession of firearms that were not

---

[2] Detective Speake also searched the other items using other applications. (Doc. 47-1 at 57-63)

recovered on 09/15/22. I also located a text message where someone was inquiring about a trade

of a revolver. I believe Marquez was involved in illegal gun sales. I located multiple pictures

which were duplicate pictures of evidence with no date stamp. After further investigation and

locating the original files noted the files were outside the date range requested." *Id*. at 78. Thus,

he sought permission to expand the date range of the search. *Id*.

**II.     Analysis**

The Fourth Amendment states, "(t)he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. amend. IV. A "search" occurs for purposes of the Fourth Amendment if the police

seek information by intruding on a person's reasonable expectation of privacy or by means of

trespassing upon one's person, house, papers, or effects. *Florida v. Jardines*, 569 U.S. 1, 5

(2013). A search warrant must allege with reasonable particularity the types of items that may be

seized. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986).

"A magistrate judge's finding of probable cause is entitled to great deference and this

court will not find a search warrant invalid if the magistrate judge had a "substantial basis" for

concluding that the supporting affidavit established probable cause. *Id*. at 1351. A magistrate

judge may issue a search warrant if, under the totality of the circumstances, there is a fair

probability that contraband or evidence of a crime will be found in a particular location." *Illinois

v. Gates*, 462 U.S. 213, 238 (1983).

**A.     The search warrant was defective in authorizing the search for property or
items that were "identified as stolen or illegal to possess."**

Mr. Marquez notes that the search warrant for the home allowed the officers to search of

property or items that were "stolen or illegal to possess." The Court agrees that this language

failed to specify with particularity the items for which the officers were entitled to search. *United

States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994). Though Mr. Marquez argues that this infirmity

should result in the Court suppressing the evidence seized, the Ninth Circuit has held that this

requires only suppression of the evidence seized pursuant to the defective portion of the warrant.

*Id.* The Court concludes that none of the items seized must be suppressed due to this overbroad

1    language. As detailed below, the Court finds that the items were seized while executing the

2    remaining, valid portions of the search warrant.

3         **B.    The search warrant properly authorized the search of all areas where items**

4    **as small as belts could be found.**

5         The affidavit details Ms. Pimental's explanation that the box truck was used to store

6    merchandise including and that these items were in the truck when it was stolen. Thus, the

7    officers were entitled to search for these items. The fact that the "catchall" language discussed

8    above lacked precision does not mean that the authorization to search for boots, belts, vests and

9    hats was imprecise. *United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir.), cert. denied, 466

10   U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984) ["Since there is no indication in the record

11   before us that there was any material seized pursuant to the warrant which did not come within

12   the descriptions of the valid portions thereof, we uphold the search."] To the contrary, this

13   authorization was clear. Mr. Marquez does not suggest that a belt or a hat could not have been

14   found in any of the locations searched or where the firearms, ammunition or methamphetamine

15   was located. Rather, he argues only that some of the areas searched could not have concealed

16   boots. (Doc. 53 at 19-24)

17        Mr. Marquez argues that at the time they conducted the search, the officers had the

18   intention to search for items, such as firearms, which were not authorized by the warrant. He

19   asserts that there is a dispute in the evidence as to whether the officers were encouraged to look

20   for firearms before the search began. Because the Court finds that this dispute is immaterial to the

21   outcome of the case, it assumes as true that this occurred. However, the legality of the search

22   warrant here is not measured against the subjective intentions of the officers.

23        *United States v. Ewain*, 88 F.3d 689, 692-695 (9th Cir. 1996) involved a similar claim. In

24   *Ewain*, the officers searched a home for methamphetamine pursuant to a valid warrant. *Id*.

25   However, believing that evidence of mail fraud may be found at the home, the officers invited

26   postal inspectors to attend the search and, indeed, they found evidence of postal theft. *Id*. at 492.

27   The defendant argued that the subjective motivation of the officers, to search for evidence of mail

28   theft, required suppression of the evidence because the warrant authorized a search for narcotics.

6

1   *Id*. The court disagreed and found there was no evidence of pretext despite the presence of the

2   postal inspectors. *Id*.

3       On appeal, the Ninth Circuit analyzed the import of the searching officers' subjective

4   intent and found it played little role in determining the validity of the search. *Ewain* at 693-695.

5   "What matters is whether the officers looked in places or in ways not permitted by the warrant.

6   That the officer invited along, and not the officer to whom the warrant was issued, has expertise

7   which makes it 'immediately apparent' to him that objects in plain view are evidence of a crime,

8   does not establish that the search went beyond the scope of the warrant."  *Id*. at 695. The Court

9   observed that "[b]ecause the officers looked only where they could properly look under the terms

10  of a particularized and proper search warrant, the householder's privacy was no more impaired

11  than it would have been had they expected to find only the things specified in the warrant." *Id.*  at

12  694. The Court determined, "In this case, we agree with the district judge's finding that the search

13  was in good faith, in the objective sense that it did not go outside the scope authorized by the

14  search warrant. Seeing the postal evidence did not require the officers to look anywhere they

15  would not have looked for methamphetamine evidence. The criminality was, without question,

16  immediately apparent to the postal inspector. The district judge properly denied the motion to

17  suppress." *Id*. at 695.

18      The warrant executed at Mr. Marquez's home was valid on its face. It specifically

19  described the property for which the officers were searching, and there is no indication that they

20  searched in areas not permitted by the warrant. In addition, the officers were engaged in a valid

21  investigation. They had significant evidence that the defendant was involved in the theft of the

22  box truck and good reason to believe that evidence of this theft would be found at the Bergquist

23  home. Indeed, they could see the top of the box truck from the street. The fact that they were

24  aware that the defendant was prohibited from possessing firearms and ammunition and

25  contemplated using a drug-sniffing dog, does not transmute this search pursuant to a valid warrant

26  into an invalid search. The officers searched in areas where the items identified in the warrant

27  could be found, and there is no indication that any of the areas searched could not have had the

28  stolen merchandise hidden inside. Thus, the motion to suppress the items found is **DENIED**.

**C.     The search of the cell phones was valid.**

The search warrant issued on September 27, 2022 allowed for the search of the phones that had been seized on September 15, 2022 at the Berquist address. (Doc. 47-1 at 43) The search warrant authorized,

> For any communication content to be searched and seized between 08/01/2022 and 09/15/2022:
>
> 1. All owner information contained within the storage on the phone or electronic device; Data to be searched and seized occurring from 08/01/2022 to 09/15/2022.
>
> 2. Any lists of internet sites which the user may have visited; Data to be searched and seized occurring from 08/01/2022 to 09/16/2022.
>
> 3. All location information that is available from the storage device contained within the cell phone or electronic device including GPS locations; Data to be searched and seized occurring from 08/01/2022 to 09/15/2022.
>
> 4. Any items, photographs, call logs, text messages, cell settings, and/or subscriber information on the phone tending to establish the identity of the person who has dominion and control of the phone or electronic device; Data to be searched and seized occurring from 08/01/2022 to 09/15/2022.
>
> 5. All electronic and digital records, documents, files, application data, messages, emails, backup files, whether deleted or undeleted; in addition to files, photographs, videos, audio recordings, message posts, social media posts, messages, emails, text messages, chat logs, notes, call logs, call records, contact lists, phone numbers, browsing history, web searches, voice messages as stored on devices, voice recordings, and any other digital/electronic records stored on the device to be searched for evidence that relates to the crimes of auto theft and/or possession of stolen vehicle(s); regarding the sales/purchasing of controlled substances and the possession and sales of stolen property; felon in possession of a firearm and ammunition. Data to be searched and seized occurring from 8/01/2022 to 09/15/2022.
>
> 6. Social media sites, i.e.; Facebook, Twitter, Instagram, etc., which are accessed through the cellular phone via downloaded apps or wireless internet connections. Data to be searched and seized occurring from 08/01/2022 to 09/15/2022.

*Id*. The rationale for this search was "to gather evidence to support the crime of auto theft, possession of a controlled substance for sale, felon in possession of firearms, possession of a controlled substance and operating a chop shop. It will also help law enforcement obtain possible leads on the missing stolen merchandise. Your affiant also believes that by searching these items co-conspirators will be identified." *Id*. at 53.

Mr. Marquez argues that the search warrant allowed the officers to gather only communication content and not the other listed items. He doesn't explain this conclusion.

8

1    Reading the warrant in the way that Mr. Marquez argues renders it nonsensical. If he is correct,

2    then the warrant would authorize search only for only parts of items 4 and 5, without explanation

3    as to why parts of these items and why items 1 through 3 and 6 were included. Likewise, if Mr.

4    Marquez is correct, then the search warrant unnecessarily and inexplicably duplicates the

5    language, "Data to be searched and seized occurring from 8/01/2022 to 09/15/2022" in every of

6    the numbered items. Though the Court acknowledges that the first item should have been

7    numbered and it should have had punctuation similar to the other listed items, these typos did not

8    preclude the search conducted. *See United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009)

9    ["A warrant need not necessarily survive a hyper-technical sentence diagraming and comply with

10   the best practices of *Strunk & White* to satisfy the particularity requirement."]

11       Mr. Marquez raises several other concerns over the validity of the search of the cell

12   phones. First, he argues that the search of the cell phones by Detective Corona exceeded the

13   authorization set forth in the search warrants. In part, he argues that the Cellebrite extraction

14   violated the date range permitted by the warrant because Officer Speake performed a full

15   extraction rather than extracting only the information contained within the date range. This

16   argument fails because the warrant anticipated that a duplicate of the phone would first be made,

17   then a date-range limited search would occur. (Doc. 47-1 at 44)

18       Second, he argues that Detective Corona failed to properly impose a date restriction in his

19   search of the Cellebrite extraction. In his affidavit for an expanded search warrant, Corona reports

20   that he searched the Cellebrite extraction and "located multiple pictures which were duplicate

21   pictures of evidence with no date stamp. After further investigation and locating the original files

22   noted the files were outside the date range requested." (Doc. 47-1 at 78) Corona explained that in

23   his experience, when using Cellebrite's date filter, photos which do not have a date associated

24   with them are not filtered out. (Doc. 48-5 at 5) Thus, the viewer must verify the undated photos

25   are within the date range manually. *Id*. Even still, Detective Corona saw at least one photo that

26   was not authorized by the search warrant. Based upon seeing the photo of a firearm that was

27   outside of the authorized period and because he learned that some of the car parts located at the

28   Bergquist address had been removed from vehicles that had been stolen outside of the authorized

1  date range, Detective Corona applied for and received another warrant, which authorized search

2  of the phones over an expanded date range. (Doc. 47-1 at 78; Doc. 47-1 at 67-70)

3      Mr. Marquez offers the declaration of Arthur Hively. (Doc. 53-2 at 7) Mr. Hively

4  describes his significant expertise in using the Cellebrite product. When he applied the date limits

5  to the extraction provided by Detective Speake, his search yielded 9,200 files. He does not claim

6  to have reviewed these files but produced a graph showing that all had dates attached to them that

7  were within the required time limit. Mr. Hively indicates that he then "conducted a search for the

8  two files previously listed as examples in Detective Corona's July 15, 2024 declaration of photos

9  he accessed that were outside the time-frame of the September 27, 2022 search warrant." (Doc.

10 53-2 at 9) The output did not include the problematic photos referred to by Corona. Thus, the

11 Court concludes that had Detective Corona structured his search in the way that Mr. Hively did,

12 he would not have viewed the extraneous photos.

13     On the other hand, Corona attests that he conducted his search differently from how Mr.

14 Hively searched. Though Mr. Hively asserts that searching in the "folder view" is the best option

15 for a date-limited search, Corona reports that, in his experience, doing so increases the risk that

16 the officer will view material that is not allowed by the search warrant. Consequently, Detective

17 Corona used the "thumbnail view." This appears to be a difference of opinion as to how the

18 Cellebrite tool is most effective, rather than evidence that Detective Corona acted intentionally.[3]

19 *United States v. Giberson*, 527 F.3d 883, 885, 889-90 (9th Cir. 2008). Because the Court finds

20 that Detective Corona acted inadvertently, there was no violation of the Fourth Amendment. The

21 proper procedure then, was for him to stop searching the device and seek a further search warrant,

22 which is what occurred. (Doc. 47-1 at 67-70)

23     If Detective Corona acted intentionally and, thus, unconstitutionally, even still, the Court

24 is unconvinced that suppression is required. *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.

25 1987) ["The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant

26

---

27 [3] Indeed, if Corona was intending to search outside of the date range specified in the warrant, the Court is stymied as to why he would have sought this limitation from the Court. The evidence seized at the home—

28 the various parts found that had been taken from several different stolen cars—appears to be sufficient support for a broader search range.

10

1    or the evidence seized pursuant to the warrant."] Ultimately, the Court concludes that these

2    photos would have been discovered inevitably. "[T]he inevitable discovery doctrine allows for the

3    admission of evidence that would have been discovered even without the unconstitutional

4    source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (citing *Nix v. Williams*, 467 U.S. 431, 443–44

5    (1984)). For the inevitable discovery exception to apply, the prosecution must "establish by a

6    preponderance of the evidence that the information ultimately or inevitably would have been

7    discovered by lawful means." *Nix*, 467 U.S. at 444. "[I]nevitable discovery involves no

8    speculative elements but focuses on demonstrated historical facts capable of ready verification or

9    impeachment." *Id*. at 444 n.5.

10          When Detective Corona sought the October 7, 2022 search warrant, in his affidavit he

11   detailed the events up to that point and explained,

12          On 09/27/22, a sealed search warrant (#16177) was issued to search the contents of
            the electronics seized under sealed search warrant #16131. While reviewing the
13          contents of the cell phones I found evidence Marquez was in possession of
            firearms that were not recovered on 09/15/22. I also located a text message where
14          someone was inquiring about a trade of a revolver. I believe Marquez was
            involved in illegal gun sales. I located multiple pictures which were duplicate
15          pictures of evidence with no date stamp. After further investigation and locating
            the original files noted the files were outside the date range requested.
16
            Through the continued investigation I also noted one of the stolen vehicle
17          components was reported stolen in August of 2021. For these reasons I am
            requesting an expanded time frame from 01/01/22 to 09/1 5/22.
18

19   (Doc. 47-1 at 78) The court issued the warrant and expanded the date range for the search of the

20   cell phones. *Id*. at 67-70. Thus, the court relied upon the fact that there may be evidence that the

21   defendant possessed other firearms not seized at the time of the search of the Bergquist house,

22   that there may be evidence that the defendant was engaged in illegal sales of firearms, that there

23   may be evidence that the defendant was involved in an auto theft in 2021 and due to the photos

24   that Corona saw that were associated with dates outside of the proscribed date range. If the Court

25   excludes the last justification for the expanded search warrant, there would still be probable cause

26   to support the warrant and the photos would have been discovered. Thus, assuming that the search

27   of the phone was unconstitutional, due to the failure to adhere to the date range, suppressing the

28   evidence is not required.

1    The defendant argues that the Court must speculate to conclude that the inevitable

2    discovery doctrine applies. However, it is a fact that Detective Corona obtained the further search

3    warrant. It is the defendant who speculates that without the photos that went beyond the date

4    range, the officer would not have sought the additional search warrant. This speculation is not

5    permitted. Even still, the Court is hard-pressed to believe that even though Officer Corona found

6    evidence of illegal sales of firearms and that the defendant may have been involved in running a

7    chop shop for an extended period, that Detective Corona would have not pursued a further

8    warrant. In any event, because the Court finds that the further warrant, based on evidence other

9    than the photos that exceeded the date limitation, would have yielded the evidence at issue, the

10    Court denies the motion to suppress the evidence.

11   **D.    No *Franks* hearing is warranted related to the conduct of the search at the home.**

12    In challenging the veracity of an affidavit in support of a search warrant, the "inquiry

13   begins with a presumption that an affidavit in support of a search warrant is valid." *United States*

14   *v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004). A defendant is entitled to an evidentiary hearing

15   under *Franks* only if he "makes a substantial preliminary showing" that: (1) the affiant agent

16   intentionally or recklessly made false or misleading statements or intentionally omitted facts; and

17   (2) the false or misleading statements or omissions were material, that is, were necessary to the

18   finding of probable cause. *United States v. Craighead*, 539 F.3d 1073, 1080–81 (9th Cir.

19   2008) (quoting *Franks*, 438 U.S. at 155–56); *see also United States v. Perkins*, 850 F.3d 1109,

20   1116 (9th Cir. 2017) (citing *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir.

21   2005)); *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011); *United States v. Johns*, 851

22   F.2d 1131, 1133 (9th Cir. 1988). An evidentiary hearing is required if the defendant presents

23   specific allegations, alleges a deliberate falsehood or reckless disregard for the truth, and supports

24   that claim with a sufficient offer of proof. *Craighead*, 539 F.3d at 1080 (citing *United States v.*

25   *Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983)). If the defendant makes this showing, "the court must

26   hold a hearing to determine if any false statements deliberately or recklessly included in the

27   affidavit were material to the magistrate's finding of probable cause." *United States v. Johns*, 851

28   F.2d 1131, 1133 (9th Cir. 1988).

1    Probable cause exists if there is a "fair probability" that a suspect has committed a crime

2    based on the totality of the circumstances. *United States v. Struckman*, 603 F.3d 731, 739 (9th

3    Cir. 2010); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause standard does

4    not require a court "to believe to an absolute certainty, or by clear and convincing evidence, or

5    even by a preponderance of the available evidence, that [a suspect] had committed a crime."

6    *United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007); *see also United States v. Gourde*,

7    440 F.3d 1065, 1069 (9th Cir. 2006) (*en banc*). If the defendant meets this burden, then "the

8    Fourth Amendment requires that ... the fruits of the search [must be] excluded to the same extent

9    as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d

10   737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

11        Mr. Marquez lists several factual disputes that he believes gives rise to the need for an

12   evidentiary hearing. (Doc. 55) However, as discussed, Mr. Marquez has not made a substantial

13   showing of any false statement made by Detective Corona. On this point, Mr. Marquez's primary

14   argument is that he does not believe that Ms. Pimental told Detective Corona that the box truck

15   contained anything other than boots. He surmises that because Corona did not prepare a report

16   detailing this information, that his statement in the affidavit must be a fabrication. Notably,

17   however, at the very first contact with Deputy Alvara, Ms. Pimental reported that the box truck

18   contained not just boots, but "a variety of 'Tres Toros' boot merchandise." (Doc. 53-1 at 4) Thus,

19   Mr. Marquez's suppositions are contrary to the evidence created before Detective Corona was

20   assigned to investigate the matter.

21        Mr. Marquez's argument that Detective Corona must not have spoken to Ms. Pimental on

22   September 8, 2022, also is inconsistent with Corona's subsequent action. Corona attested that on

23   September 8, 2022, when he spoke to Ms. Pimental, she clarified the types of items that were in

24   the truck but also reported that the box truck had little gas in it. (Doc. 47-1 at 8) This conversation

25   caused the detective to the search for additional video footage from nearby gas stations. *Id.* This

26   effort yielded video of the box truck and van at the Chevron station, which revealed the license

27   plate of the van. *Id.* This, in turn, revealed the identity of the owner of the van—the defendant—

28   and lead to locating the box truck and the van at the Bergquist address. *Id*. There is no showing

13

1    that this conversation with Ms. Pimental on September 8, 2022 was not the impetus for the effort

2    to locate this evidence. Thus, the Court rejects Mr. Marquez's unsupported speculation and finds

3    he has not made the required showing for the evidentiary hearing.

**ORDER**

5        For the reasons set forth above, the motion to suppress and for an evidentiary hearing

6    (Doc. 47) is **DENIED.**

IT IS SO ORDERED.

9     Dated:   **December 23, 2024**

UNITED STATES DISTRICT JUDGE